## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

MICHELLE L. HAGELE,        )
                                    )
         Plaintiff,        )
                                    )
         v.                 )     Case No. 20-cv-3100
                                    )
ANDREW SAUL,            )
Commissioner of Social Security,  )
                                    )
         Defendant.     )

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Michelle L. Hagele appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). Hagele filed a Motion for Summary Judgment (d/e 14). The Defendant Commissioner of Social Security filed a Motion for Summary Affirmance (d/e 18). Hagele filed a Reply to Commissioner's Motion for Summary Affirmance (d/e 19). The parties consented to proceed before this Court. <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered May 5, 2020 (d/e 7)</u>. Plaintiff's request for oral argument is denied.

For the reasons set forth below, the Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

### Background

Hagele was born on July 12, 1973. She graduated from high school in 1991, completed licensed practical nursing training in 2003, secured an associate degree in nursing in 2010, and became a registered nurse. She worked as a licensed practical nurse from 2003 to 2010 and as a registered nurse from 2010 to 2014. Hagele suffered from the following severe impairments: affective disorder, anxiety, status post brain aneurysm, fibromyalgia, a nervous system disorder, and a spine disorder. She suffered a subarachnoid hemorrhage and cerebral aneurysm rupture on March 13, 2014 and filed her application for Disability Benefits on August 26, 2016. Hagele alleged that her disability began on February 11, 2015 (Onset Date). She had previously filed an application for Disability Benefits which was denied. The Administrative Law Judge (ALJ) in the prior proceeding determined that Hagele was not disabled on or before February 10, 2015. Certified Transcript of Proceedings before the Social Security Administration (d/e 12 and 13) (R.), 36, 39, 49, 84-104, 281, 1991, 2003.

## Evidence Before the Evidentiary Hearing

On December 17, 2014, Hagele saw her psychiatrist Dr. Laura Shea, M.D. Hagele had a history of atypical anxiety, depression, attention deficit disorder, and irregular sleep. Dr. Shea noted that Hagele "seems to be recovering from that in many ways" from her subarachnoid hemorrhage. Hagele said Adderall helped her and also reported problems sleeping. Dr. Shea stated that Hagele was alert, oriented, and her affect was neutral. Hagele became irritated but was "quite cooperative." R. 1880. Dr. Shea suggested psychotherapy, but Hagele said she could not afford it. R. 1881. Dr. Shea renewed the prescription for amphetamine-dextroamphetamine (Adderall) and started tapering off her prescription of alprazolam (Xanax). R. 1881-82.

On February 24, 2015, Dr. Shea completed a Social Security Mental RFC Questionnaire. R. 427-34. Dr. Shea diagnosed Hagele with recurrent depression, atypical anxiety disorder, and attention deficit disorder. Dr. Shea had been treating Hagele for 10 years; her mental impairments caused mood disturbances, emotional lability, and problems with impulse control; her depression caused sleep disturbance, decreased energy, and difficulty concentrating; her anxiety disorder caused motor tension, autonomic hyperactivity, apprehension expectation, persistent irrational

fear, and recurrent intrusive recollections of traumatic experiences. Hagele's mental impairments caused severe fatigue and she could only tolerate a low stress job. Dr. Shea opined that Hagele's symptoms from her mental impairments would interfere with her ability to retain competitive employment and that her impairments mildly affected her ability to perform activities of daily living and moderately affected her ability to maintain social functioning and to maintain concentration, persistence, or pace. Dr. Shea said that Hagele had a fair ability to: understand, remember, and carry out either simple, detailed, or complex job instructions; to deal with coworkers, supervisors, and the public; deal with changes in work routines; make basic work decisions and exercise proper judgment; maintain attention and concentration; to work near others; be punctual and maintain a work schedule; and maintain socially appropriate behavior. Dr. Shea said that Hagele had a good ability to sustain an ordinary work routine without special supervision and that she had a poor ability or no ability to complete a normal workday or a workweek without interruptions from psychologically based symptoms. Dr. Shea opined that Hagele would miss work four or more times a month due to symptoms from her mental impairments. R. 427-33.

On March 9, 2015, Hagele saw Dr. Shea.  She reported having a bad headache and significant depressive symptoms but denied being suicidal, and said she might go back to counseling.  Dr Shea observed that Hagele was alert, oriented, and made good eye contact; she demonstrated good insight and judgment; her flow of thought was unremarkable except she had one problem with "word finding."  R. 1870.

On June 2, 2015, Hagele saw Dr. Shea.  She reported low energy, insomnia, and poor appetite.  R. 1845.  On examination, Hagele was oriented and cooperative, her mood was nervous, and her affect was blunted.  She had good eye contact, normal speech, intact judgment, logical/coherent thought process, no psychosis, good insight, and no suicidal thoughts or intentions.  R. 1846.  Dr. Shea assessed attention deficit hyperactivity disorder and generalized anxiety and renewed the prescription for Adderall.  Dr. Shea recommended regular aerobic exercise and suggested the possibility of gradually reducing her medications. Hagele was reducing her dosage of lorazepam (Ativan).  R. 1847.

On August 4, 2015, Hagele saw Dr. Shea.  She was fatigued and depressed, "but overall is doing better" compared to her previous couple of office visits.  Her irritability was better since she started taking Ativan and the stimulant (Adderall) was helping her "concentrate and get things done."

Dr. Shea previously explained to Hagele about the problems of taking an antianxiety medication and a stimulant.  Hagele said that Dr. Shea never told her that and Dr. Shea noted that this exchange caused concerns about Hagele's memory.  R. 1826.  On examination, she was oriented, cooperative, able to concentrate and remember, and had no abnormal motor activity; her mood was nervous, she had good eye contact, a blunted affect, normal speech, intact judgment, a logical/coherent thought process, no psychosis, no delusions, fair insight, and no suicidal or homicidal ideations.  Dr. Shea continued her medications and told her to engage in regular aerobic exercise and to consider starting psychotherapy.  R. 1828.  Dr. Shea concluded with this note:

> A:  Depression and anxiety, seems to have worse functioning and diminished ability to concentrate and cope with stress since the cerebral aneurysm.  She had fatigue and poor concentration before the aneurysm.
>  P:  Continue same for now.  Thoroughly discussed risks and benefits with her.  Will eventually address polypharmacy, but am slow to do so because she is reported improvement at this time.

R. 1829.

On October 19, 2015, Hagele had a neuropsychological assessment. R. 1991-2035.  She had a prior neuropsychological assessment in September 2014.  Several of her test scores declined from the September 2014 assessment, but some improved.  R. 1991, 2002.  Hagele's full scale

IQ score was 82, low average; her perceptual reasoning scores were low average; her working memory scores were average; her processing speed scores were average; her academic achievement scores were average to low average; her attention scores were average to low average; her new learning and memory scores were average to high average; her problem solving scores were primarily low average with some high average and borderline scores; her language scores ranged from borderline to high average; her visuospatial functioning scores ranged from borderline to average; her everyday executive functioning was mildly impaired; her performance-based measures of executive functioning ranged from average to superior; and her self-report mood measures showed depression and moderate anxiety.  R. 1998-2000.

On April 11, 2016, Hagele saw Dr. Shea.  She reported her depression was stable since her last visit.  On examination, Hagele was oriented and cooperative; her mood was anxious and depressed, and her affect was restricted and appropriate; her speech had a regular rate and rhythm, but she had one word substitution; her thought process was linear and relevant without delusions or hallucinations.  She did not have any homicidal or suicidal ideations; her insight and judgment were good, and her concentration was impaired; her recent and remote memory were

intact; and her fund of knowledge was intact.  R. 1889.  Dr. Shea recommended regular aerobic exercise and continuing psychotherapy with a therapist.  R. 1890.

On July 29, 2016, Hagele saw her primary care physician Dr. Eric Bleyer, M.D.  She complained about intense neuropathic pain in her lower extremities, despite the fact that she had a normal MRI and nerve conduction studies.  She said muscle relaxants helped and reported pain in her neck.  Dr. Bleyer said Hagele's attention deficit disorder was better with treatment and her mood was "okay but frustrated with ongoing medical problems."  Dr. Bleyer said that Hagele was "intolerant to stressful situations."  He continued, "In my opinion given all her ongoing medical problems at this time unable to seek gainful employment."  R. 2229.  Dr. Bleyer did not conduct a physical examination and renewed Hagele's medications and restarted physical therapy for her back.  R. 2232.

On August 1, 2016, Hagele saw Dr. Shea.  She reported that her depression had worsened since her last visit.  R. 1830.  On examination, Hagele was oriented and cooperative; her mood was anxious and depressed, and her affect was restricted.  Hagele had normal eye contact; speech with regular rate and rhythm; normal psychomotor function, but with use of a walker; linear and relevant thought processes; good insight and

judgment; and intact memory and fund of knowledge.  Hagele's balance was not good and affected her station and gait.  She had no delusions, hallucinations, or homicidal or suicidal ideations.  R. 1832.

On August 2, 2016, Dr. Bleyer completed a General RFC Questionnaire for Hagele.  R. 790-97.  Dr. Bleyer started treating Hagele in December 2013 and said her prognosis was fair.  Dr. Bleyer opined that Hagele's pain and other symptoms frequently interfered with her attention. He said she was incapable of performing even low stress jobs, she used an assistive device to walk, and her symptoms rendered her unable to engage in competitive employment.  R. 791.  Dr. Bleyer said that Hagele was moderately limited in performing activities of daily living and that she needed to lie down periodically throughout the day to reduce her symptoms.  He said that she would miss work four or more times a month and her fatigue would moderately interfere with her ability to work.  Dr. Bleyer opined that Hagele could lift 10 pounds occasionally but could not lift heavier weights.  R. 792.  She could walk less than a block; she could sit for an hour at a time and stand for 15 minutes at a time; she could sit for a total of less than two hours in an eight-hour workday and could stand/walk for a total of less than two hours in an eight-hour workday; and she would need to change positions at will at any job.  Dr. Bleyer said that Hagele

could occasionally twist, stoop, kneel, crouch, pull, push, grasp, and walk up an incline; and she could never bend, climb, crawl, reach, do overhead work, do static neck flexion, or do frequent neck rotation.  Dr. Bleyer said that Hagele could not perform repetitive activities with her hands and upper extremities, and she could not perform activities that required either manual dexterity, repetitive hand actions, or manipulations of small objects.  He opined that if Hagele returned to work, her symptoms would become more severe, increasing to a markedly severe level.  R. 792-93.

Dr. Bleyer opined that Hagele's mental impairments moderately limited her ability to perform activities of daily living and markedly limited her ability to maintain social functioning, concentration, and persistence or pace.  He stated that Hagele experienced four or more periods of decompensation in one year, each lasting two weeks.  R. 794-95.

Dr. Bleyer said that Hagele had a fair ability to: understand, remember, and carry out simple job instructions; deal with coworkers, supervisors, and the public; make basic decisions at work; work near others; and maintain socially appropriate behavior; but, she had a poor ability or no ability to: understand, remember, and carry out either complex instructions;  deal with changes in work routine; maintain concentration;

complete a normal workday or workweek; sustain a routine without

supervision; or be punctual and maintain a regular schedule.  R. 796-97.

On August 2, 2016, Hagele saw neurologist Dr. Fazeel Siddiqui,

M.D., for an annual follow up after her ruptured aneurysm and hemorrhage,

and hydrocephalus.  R. 1560-65.  Dr. Siddiqui stated that at the time of the

rupture Hagele underwent a ventriculostomy, a coiling of the rupture, and a

VP shunt for the hydrocephalus because she could not be weaned off the

ventriculostomy.   He said that Hagele started taking Depakote for seizures

at that time and that she was stable in 2015 and showed some gradual

decline in memory and cognition at an evaluation in March 2016.  Hagele

reported that she fell in March 2016 and suffered a concussion and injured

her back.  She had left back pain that radiated down to the left knee and

the pain had been a shooting pain since the fall.  Hagele had no weakness

or loss of sensation from the March 2016 incident.  Dr. Siddiqui said that at

the last visit he ordered MRIs of her spine and an EMG study, which were

unremarkable for radiculopathy.  R. 1560.  Hagele stated that at the time of

this August 2016 visit she was "doing relatively okay."  She reported

memory issues, but most of her problems were stable and she had no new

issues.  She discussed mood changes and anger issues.  R. 1560.  On

examination, Dr. Siddiqui stated that the neurological exam was unchanged.  Hagele scored 28/30 on a mini-mental exam.  R.  1564.

On November 7, 2016, Hagele saw Dr. Shea.  She reported that her depression was stable.  She had anxiety, fatigue, muscle tension, nervousness, sleep disruption, and sadness; but she had no headache, delusions, racing thoughts, ruminations, irritability, panic attacks, or suicidal thoughts.  R. 2291.  On examination, she was oriented and cooperative, her mood was anxious, and her affect was full and appropriate.  Her eye contact was normal, her speech was at a regular rate and rhythm, and her psychomotor was normal except she used a walker.  Her thought process was linear and relevant; and her thought content had no delusions or hallucinations and no homicidal or suicidal ideations; her concentration was normal and her recent and remote memory were intact; her fund of knowledge was intact.  R. 2293.

On November 18, 2016, Hagele completed a Function Report – Adult form.  R. 260-67, 270-78.  She suffered from pain, fatigue, nausea and vomiting, headaches, and poor vision; her symptoms resulted in poor concentration and she had attention deficit disorder and stress.  She also had severe chronic abdominal pain. R. 270.

Hagele reported that every day was different.  On good days, she got her son ready for school and her husband or daughter usually drove her son to school.  She rarely drove her son to school when no one else was available.  After her son was off to school, she went back to bed to sleep for a few hours, then ate when she woke and watched television, including sports and news.  She occasionally took walks with her husband and spent time with her son after school.  They occasionally played games such as go fish and checkers.  R. 260, 271, 274.  Hagele listened to recorded material almost daily and read but she needed large print and additional lighting.  She read for "shorter periods."   She attended her children's activities and sports games occasionally, but her headaches limited her attendance to these events.   She said that she attended "less & less depending on the length of the required walk & time length of events, as well as amount of people."  R. 274.

Hagele's husband and daughter did all the cooking and housework as she could not cook because she could not stand, open jars, or stir.  She also had too much anxiety if she had too many things to do at once. Hagele put clean clothes away if someone brought the clean clothes to her bedroom.  R. 271-72.

Hagele took care of her personal care, except that she needed help fastening her bra.  She needed a shower chair to take a shower, and she shaved on rare occasions while seated on the shower chair.  Hagele needed reminders to take care of her personal needs and to take her medications.  R. 271-72.

Hagele tried to go outside daily and she walked and rode in a car. She rarely drove and only for short distances.  She did not drive much because she had problems with her peripheral vision and depth perception. She did a small amount of shopping and said her husband did 95 percent of the shopping.  She did shop for Christmas presents and clothing in stores and online, but she spent no more than 30 minutes shopping at one time due to pain, headaches, and social anxiety.  She could not pay bills or handle a savings account as she sometimes paid some bills two or three times and did not pay other bills at all.  She said, however, that she could use a checkbook.  R. 273.  She used a computer one to two times a week, went to church once a week, and went to doctors' appointments and her son's school activities.  She did not need anyone to accompany her, but occasionally someone accompanied her to drive.  R. 260, 274.

Hagele spent time with her immediate family, but had problems getting along with people after her aneurysm.  She became "anti social"

and "grouchy extremely quick for no reason."  She did not engage in social activities.  R. 264, 275.

Hagele reported that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others.  She could lift 10 pounds occasionally, walk no more than one city block due to back pain, and climb no more than one flight of stairs if she had some assistance.  R. 263, 275.  Hagele said she could not bend over, climb stairs or ladders, or reach up or to the side. Turning her head and squatting caused dizziness, nausea, pain, and tightness.  She reported "extreme memory concerns" as well as "decreased cognitive functioning."  She had issues with peripheral vision and depth perception; in addition, walking in and out of light and dark areas was blinding to her.  R. 261-62, 264, 270.

Hagele said she had a short attention span, she did not finish what she started, and she could not follow written or spoken instructions well. She could follow short spoken instructions "like write your name in pen."  R. 275; see R. 261.  She believed she could get along with authority figures, but she could not handle stress or changes in routine.  R. 276.

On November 18, 2016, Hagele also completed a Physical Impairments Questionnaire.  R. 279-80.  She said she could not use a can opener or open jars or other twist lids; she could use a knife sometimes; she could turn pages for short periods, dial a phone, and use a pen or pencil; and she noted that her handwriting was sloppy.  She could sometimes carry groceries, but she could not carry laundry or trash.  She could not reach overhead due to her shunt.  She could reach above the waist.  R. 279.  Getting in and out of a car caused pain, fatigue, and weakness and she occasionally needed help getting out of a car.  She could get out of a chair, but she also noted that a week earlier she became dizzy getting out of a chair.  She needed help to get out of bed every morning due to back pain.  She could sit for an hour and needed rest during the day, but the amount varied.  Sometimes she slept for days.  R. 280.

On January 18, 2017, Hagele saw state agency psychologist Dr. Delores Trello, Psy.D., for a mental status examination.  R. 2221-25.  Hagele lived with her husband and nine-year old son, along with her three children from a prior marriage ages 18, 20 and 24.  She walked "quickly" with a walker and used the walker because she had problems with depth-perception and peripheral vision.  She was irritable and angry without a

reason and had occasional outbursts of temper.  She reported memory problems.  R. 2221.  Hagele had no friends after she suffered the ruptured aneurysm.  She did not cook and she needed assistance with the laundry. She took care of her own showering and personal care and went shopping sometimes with her husband.  She said that she did not drive; her concentration was poor.  R. 2223.  On examination, Hagele's affect was normal, her stream of conversation was relevant and coherent. She was oriented and had no hallucinations, delusions, psychosis or thought disorder; and her immediate and remote memory were intact.  Hagele could perform serial 7s backward from 100 and correctly performed simple calculations.  Dr. Trello assessed depression and anxious mood.  R. 2224-25.

On January 25, 2017, state agency psychologist Dr. Russell Taylor, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment for Hagele.  R. 120-22.  Dr. Taylor found that Hagele suffered from depressive related disorders and anxiety disorders.  He opined that Hagele's mental impairments caused:  mild limitations on her ability to understand, remember, or apply information and interact with others; moderate limitations on her ability to concentrate, persist, or maintain pace; and moderate limitations in her ability to adapt or

manage oneself.  R. 120.  Dr. Taylor opined that Hagele was moderately

limited in her ability to carry out detailed instructions; maintain attention and

concentration for extended periods; complete a normal workday and

workweek without interruptions from psychologically based symptoms; and

respond appropriately to changes in work setting.  R. 124-25.  Dr. Taylor

concluded:

> The clmt retains the mental capacity to understand and
> remember multi-step instructions. Due to her anxiety,
> depressive symptoms she would have a moderate limitation
> persisting for a normal work period with multi-step instructions.
> She could do so for one and two step instructions. She could
> make work related decisions and could interact and
> communicate sufficiently in work environment. She could adapt
> to simple, routine changes and pressures.

R. 125.

On January 27, 2017, state agency physician Dr. Bharati Jhaveri,

M.D., reviewed Hagele's medical records and stated that she suffered from

fibromyalgia, hypothyroidism, seizure activity and migraines managed

medically.  Dr. Jhaveri opined that physical impairments were non-severe.

R. 120.

On March 6, 2017, Hagele saw psychiatrist Dr. Laura Shea, M.D.

Hagele reported headaches, tired low energy, anxiety, difficulty

concentrating, fatigue, irritability, and pain.  She felt hot all the time and had

unexplained weight gain.  R. 2243.  On examination, Hagele was well

groomed, oriented, and cooperative; her mood was anxious and depressed, and her affect was restricted and appropriate; her eye contact and psychomotor were normal; her thought process was linear and relevant; her insight and judgment were good; her recent and remote memory were intact; her fund of knowledge was intact; and her gait and station were within normal limits.  Hagele had no delusions or hallucinations, and she had no homicidal or suicidal ideations.  R. 2245.

On March 30, 2017, Hagele saw psychiatrist Dr. Laura Shea, M.D. for a routine follow up.  She reported that her depression had worsened since the last visit.  She had symptoms of headache and malaise, but no hallucinations, delusions, or thoughts of suicide.  She used a walker and was not physically active.  R. 2233.  On examination, Hagele was cooperative, and oriented; her mood was anxious and depressed; her affect was full, reactive, and anxious; her eye contact was normal; and her speech was rapid.  Her psychomotor was normal except for using a walker and she had some somatic preoccupation.  Hagele's insight was good, her concentration was normal, her recent and remote memory were intact, her fund of knowledge was intact.  R. 2235.  Dr. Shea assessed attention deficit disorder, generalized anxiety disorder, and major depressive disorder, recurrent episode, moderate.  R. 2236.

On April 23, 2017, Hagele completed another Function Report – Adult form.  R. 324-50.  She reported that her condition had worsened and she suffered from chronic pain, migraines, memory issues and loss, extreme fatigue, moya moya, depression, anxiety, vision issues including depth perception and peripheral disturbances, and body weakness. R. 324.

In a typical day, Hagele made sure her nine-year-old son was ready for school.  She brushed her teeth, and then she spent most of the day in her recliner.  Hagele's husband otherwise took care of her son and she spent time daily watching television, reading Joyce Meyer, and playing online games.  R. 330.  She took care of her personal care, although she occasionally needed help fastening her bra.  She needed a shower seat and grab bars to shower and her personal care tasks were exhausting. She slept for 18 to 24 hours after each shower due to extreme exhaustion. Any mental or physical activity generally exhausted her.  As a result, she regularly slept for more than 24 hours at a time.  R. 325-26.

Hagele reported that she needed reminders to take her medications. A couple times a week, she prepared simple meals such as a bowl of cereal, oatmeal, pop tarts, and SpaghettiOs.  She did no household chores except rinsing her dinner plate.  She did not do housework because of her pain, migraines, vision problems, fatigue, and memory issues. R. 327-28.

Hagele tried to go outside daily.  She walked, rode, and drove, but she could not go out alone.  She went shopping for brief periods and shopped online.  She could not pay bills or handle a savings account due to her memory and concentration problems.  R. 328-29.  Hagele tried "her best" to attend church and her son's games "on a semi-regular basis."  She had problems getting along with others.  She said she used to be a "social butterfly."  R. 331.

Hagele reported that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others.  She could walk for less than half a block before she had to rest for five minutes and she had to use a walker and needed someone with her to walk.  She could stand for "very short" amounts of time. She could not lift, squat, kneel, bend, climb stairs and she had to change positions when she sat. She had difficulty speaking because she could not remember the correct words.  She had problems with depth perception and peripheral vision and she felt completely blind for three to five minutes when she went from a well-lit area to a darker area and back. She used a magnifying glass to read and her ability to pay attention depended on her interest in the subject.  She could not follow instructions.

She got along with authority figures, but she could not handle stress or changes in routine.  She used a walker, braces, and a wheelchair.  R. 331-42.

On May 26, 2017, Hagele saw Dr. Trello again for another mental status examination.  R. 23991-94, 2396.  Her communication was easily understood and she reported difficulty sleeping.  She woke up two to six times a night.  She also reported that she had been falling "a lot" and she had outbursts of temper.  Hagele said that she had a few friends.  She bathed and clothed herself except she needed help with her bra, but she did not do household chores.  She could do laundry but could not carry the laundry, she shopped for food with her husband, and she was very forgetful.  On examination, Hagele had a tense affect; her stream of conversation was relevant and coherent; she was oriented and did not show evidence of hallucinations, delusions, psychosis, or thought disorder.  She was well-informed, she was able to provide abstract meanings to simple proverbs, and she attempted to provide solutions to hypothetical situations.  Hagele could perform serial 7s backward from 100 and correctly performed simple calculations.  R. 2392-93.  Dr. Trello assessed depressive disorder due to medical conditions with depressive features and

generalized anxiety disorder.  R. 2393.  He noted that Hagele was unable to work as a nurse.  R. 2394.

On April 14, 2017, Hagele completed a seizure questionnaire.  R. 309-10.  She reported having her last seizure on March 13, 2014.  R. 309.  Hagele said her neurologist told her that her EEG in April 2016 was abnormal due to mild diffuse background slowing.  She was taking seizure medication at the time of the EEG so "none of my typical habitual spells or seizures were recorded."  R. 310.

On June 12, 2017, Hagele saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  R. 2400-03.  Dr. Chapa stated that he obtained a reliable history from Hagele.  She reported that she had a ruptured brain aneurysm and related subarachnoid hemorrhage; she had memory problems; she experienced falls and used a walker; she had no peripheral vision and problems with her depth perception; she reported constant headaches; she said she had moyamoya disease; she had a shunt and six coils in her brain.  She said her joints hurt, and she could not stand for long periods.  She had difficulty sleeping, and she had difficulty finding words.  R. 2400.  On examination, Hagele used a wheeled walker.  She was 63 and ¼ inches tall and weighed 212 pounds.  Her vision was 20/70 on the right and 20/30 on the left and she had temporal

field defects with her vision.  Her speech was clear and understandable.

Hagele could ambulate 50 feet without a walker; she had no edema in her

lower extremities; her reflexes were symmetric; her sensory exam was

normal; and she had no motor weakness or muscle atrophy.  Her motor

strength was 5/5.  She had no joint redness, heat, swelling or thickening

and she showed no evidence of paravertebral muscle spasm.  Her hand

grip was 5/5 bilaterally and she could perform fine and gross manipulations

bilaterally.  Her lumbosacral spine flexion was normal.  Her straight leg

raising tests were negative bilaterally.  She had full range of motion in her

joints and her cerebellar function was grossly intact.  R. 2401-02.  Hagele

told Dr. Chapa that she could not heel-toe walk or tandem walk.  R. 2400.

Dr. Chapa diagnosed status post brain aneurysm rupture, status post

subarachnoid hemorrhage, history of vision problems, and history of gait

impairment.  Hagele was cooperative during the examination.  R. 2403.

On June 13, 2017, state agency psychologist Dr. Thomas Low,

Ph.D., prepared a Psychiatric Review Technique and Mental Residual

Functional Capacity Assessment of Hagele.  R. 142-44, 148-50.  Dr. Low

repeated Dr. Taylor's January 25, 2017 findings.

On July 3, 2017, Hagele saw neurologist Dr. David Carpenter, M.D.,

for a neurological consult.  R. 2417-19.  On examination, Hagele was in no

acute distress; she was alert with fluent speech and intact comprehension;
her attention and fund of knowledge were grossly normal; she had a wide-
based gait that was steady; she had intact finger-to-nose, heel-to-knee, and
rapid alternating movements throughout.  Imaging showed that she had
occlusion of the left middle cerebral artery and she might have moyamoya
collaterals, but Dr. Carpenter noted that this "was not the same as having
moyamoya process in the sense that individual with basal occlusive
vasculopathy have.  If her occlusion is in fact related to the atherosclerotic
disease (which seems likely) then continued aggressive treatment of stroke
risk factors is generally the current recommended treatment."  R. 2419.
The atherosclerotic disease occlusion appeared to be related to Hagele's
history of smoking.  R. 2417.

On July 24, 2017, state agency physician Dr. Richard Bilinsky, M.D.,
prepared a Physical Residual Functional Capacity Assessment of Hagele.
R. 144-48.  Dr. Bilinsky opined that Hagele could occasionally lift 10
pounds and frequently lift less than 10 pounds; sit for six hours in an eight-
hour workday; stand and/or walk for two hours in an eight-hour workday;
occasionally climb ramps and stairs; never climb ropes, ladders, and
scaffolds; should avoid concentrated exposure to extreme cold and

extreme heat; and should avoid concentrated exposure to vibration.  R. 146-47.

On December 22, 2017, Hagele saw pain specialist Dr. Anwuli Okoli, M.D.  She reported abdominal pain, back pain, wrist and shoulder pain, and diffuse joint pain and rated her pain at 4/10.  Her major issue at the time was back pain which was worse with standing and activity and sometimes radiated down into her lower extremities.  She could not perform her activities of daily living due to the pain.  She walked with a walker and reported motor weakness and paresthesias.  R. 2421.  Dr. Okoli noted that a February 2017 MRI showed mild fact arthropathy and disc height loss at the L5-S1 level in her spine.  On examination, Hagele was oriented and in no acute distress; she had 5/5 strength in her lower extremities; she was negative for facet loading pain and had mild tenderness to palpation along the lumbar spine and over her abdomen.  Straight leg raising testing was positive bilaterally and she had no other gross neurological deficits.  R. 2422-23.  Dr. Okoli scheduled an epidural steroid injection at L5-S1 and recommended a reduction in her use of opioid pain medication.  R. 2423.

The Evidentiary Hearing

On December 18, 2018, the ALJ conducted an evidentiary hearing. R. 56-83.  Hagele appeared with her attorney.  Hagele's husband Brian

Hagele and Vocational expert Dennis Gustafson also testified at the hearing.  R. 58.

Hagele testified first.  She was 45 years old and lived with her husband and her 11-year-old son in a one-story home with a basement. She rarely drove her son to or from school.  She only drove her son if her daughter or niece could not.  R. 61.  Hagele said she could not work due to her anxiety, depression, and fatigue and stated she could not "even get out of bed for days at a time" due to chronic pain and fatigue.  She said that she would only be able to show up at work once a week or once a month. R. 73.

Hagele said she had pain in her back, abdomen, neck, and wrist and had carpal tunnel syndrome in her left wrist and hand.  R. 63.  She had headaches, and she stayed in bed for days at a time.  She also had problems with depth perception and peripheral vision, problems with memory and thoughts.  R. 72.

Hagele said that she had injections in her back for pain and took pain medication.  R. 65-66.  The injections did not help.  R. 74.  Hagele also took medication for her depression and anxiety and said that taking the depression and anxiety medication was "better than not having them."  R. 67.

When Hagele got up in the morning, she took care of her personal needs except her husband helped hook her bra.  Her husband cooked the meals as she had not cooked since the aneurysm rupture.  After her son left for school, she sometimes had a friend come over to sit and talk, or she sometimes went back to bed to sleep.  R. 66-67.  She also watched news on the television and went to doctors' appointments.  She sometimes went to her son's basketball and baseball games, but her level of activity depended on how she was feeling.  She said she might have a good month and then three bad months.  R. 69.  She had not shopped for groceries or gone to church for several months.  R. 70.  She could barely use a computer.  R. 74.

Vocational expert Gustafson testified.  Hagele had no objections to Gustafson's qualification.  R. 75.  The ALJ asked Gustafson the following question:

> Q Assume the past work activity, same as the claimant's; exertional capacity limited to sedentary work; no climbing of ladders, ropes, or scaffolds; other postural functions could be performed occasionally; need to avoid concentrated hazards -- or, I mean, need to avoid hazards such as unprotected heights and dangerous machinery; occasional overhead reaching; other manipulative functions could be performed frequently; need to avoid concentrated exposure to extreme temperatures and vibrations; [INAUDIBLE] to moderate deficits in concentration, persistence, and pace; a limitation to understanding simple, routine instructions, to making simple, work-related decisions, and to perform [phonetic] simple and routine tasks on a

sustained basis, with only regular scheduled work breaks, and with little, or no, change in work settings or duties; [INAUDIBLE] to moderate social limitations be no interaction with general public, occasional interaction with coworkers and supervisors. Obviously, all the past work would be precluded, correct?

R. 76.  Gustafson agreed that such a person could not perform Hagele's past relevant work.  Gustafson opined that such a person could perform sedentary, non-machine related manufacturing jobs, including production inspection jobs, with 9,000 such jobs in the national economy; production worker jobs, with 15,000 such jobs in the national economy; and hand packaging jobs with 13,000 such jobs in the national economy.  R. 77.  Gustafson said that a person would need to be on-task 90 percent of the time at these jobs except for scheduled breaks, and the person could not be absent more than twice a month.  R. 79.

Hagele's husband Brian Hagele then testified.  He testified that Hagele spent her days in bed or in a recliner.  She was in pain "a lot of the time."  R. 81.  Hagele's only activity was watching television.  She did not do any housework and he did not think Hagele could work.  R. 82.

<u>THE DECISION OF THE ALJ</u>

On March 7, 2019, the ALJ issued his decision.  R. 36-50.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.  20

C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,

Step 3 requires a determination of whether the claimant is so severely

impaired that she is disabled regardless of her age, education, and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet or be equal to

the criteria of one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the

Analysis.

Step 4 requires the claimant not to be able to return to her prior work

considering her age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to her prior work, then Step 5 requires a

determination of whether the claimant is disabled considering her RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden at Step 5 to present evidence that,

considering the listed factors, the claimant can perform some type of

gainful employment that exists in the national economy.  20 C.F.R. §§

404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir.

2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

 The ALJ found that Hagele met her burden at Steps 1 and 2.  She

had not engaged in substantial gainful activity since February 11, 2015, her

Onset Date, and she suffered from the severe impairments of affective

disorder, anxiety, status post brain aneurysm, fibromyalgia, a nervous

system disorder, and a spine disorder.  R. 38-39.

 At Step 3, the ALJ found that Hagele's impairments or combination of

impairments did not meet or equal a Listing.  The ALJ considered Listing

1.04 for disorders of the spine.[1]  The ALJ found Hagele did not meet that

Listing because she did not present evidence of nerve root compression,

spinal arachnoiditis or lumbar spinal stenosis; and Hagele did not show that

her back disorder resulted in an inability to ambulate effectively.  R. 39.

The ALJ considered the Listing 11.04 for vascular insult to the brain.  The

ALJ found that Hagele did not meet this Listing because she did not

present evidence of sensory or motor aphasia, significant and persistent

---

[1] The Listing for disorders of the spine have subsequently been amended.  Currently, the Listings for disorders of the spine are Listings 1.15 and 1.16.  <u>See</u> 85 Fed. Reg. 78164, at 78175-80, 2020 WL 7056412, at *78175-80 (December 3, 2020).

disorganization of motor function in two extremities, or a marked limitation in areas of mental functioning.  The ALJ also found Hagele's impairments did not meet the Listing 14.09D for inflammatory arthritis.  He also noted that no acceptable medical source offered an opinion that Hagele's physical impairments met or equaled a Listing.  R. 39.

The ALJ also considered Listings for mental impairments.  He considered Listing 12.02 for neurocognitive disorders; Listing 12.04 for depression and related disorders; Listing 12.06 for anxiety and related disorders; and Listing 12.08 for personality impulse control disorders.  The ALJ found that Hagele's mental impairments caused mild difficulties in understanding, remembering, or applying information; moderate difficulties in interacting with others; moderate difficulties in concentrating, persisting, or maintaining pace; and mild difficulties in adapting or managing oneself. The ALJ relied on Hagele's two Function Reports, the October 19, 2015 neuropsychological evaluation that showed her mental abilities to be at low average or above in almost all categories, and Dr. Trello's mental status examinations.  The ALJ also cited the numerous office visits in which Hagele was oriented and no one had any problems interacting with her.  R. 40.

At Step 4, the ALJ first determined that Hagele had the following

RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), consisting of lifting and carrying no more than ten pounds at a time. The claimant is able to sit for six hours in an eight-hour workday and stand or walk for two hours in an eight-hour workday. The claimant can perform no climbing of ladders, ropes, or scaffolds, but can perform other postural activities on an occasional basis. She needs to avoid hazards such as unprotected heights and moving machinery. She can occasionally reach overhead with all other manipulative functions able to be performed frequently. However, she must also avoid concentrated exposure to extreme temperatures and vibrations. The claimant is limited to understanding simple routine instructions, making simple work-related decisions, and performing simple and routine tasks on a sustained basis with only regularly scheduled breaks and with little or no change in work setting or duties. She can have no interaction with the general public and only occasional interaction with coworkers and supervisors.

R. 41.  The ALJ found that the medical evidence did not support Hagele's

statements about her symptoms.  He relied on Hagele's April 2017 seizure

questionnaire in which she stated that she had not had a seizure since

March 2014; the March 2016 MRI and EMG studies that were normal; the

February 2017 MRI that showed mild facet arthropathy and disc height loss

at L5-S1; Dr. Okoli's December 2017 examination in which she rated her

pain at only 4/10 and in which she was negative for facet loading pain and

found only limited tenderness to palpation; Dr. Carpenter's July 2017

neurology consult report as well as other examination notes that showed Hagele was alert with normal speech, memory, concentration, attention, and fund of knowledge; Dr. Chapa's examination; the October 2015 neuropsychological evaluation that showed Hagele to be in the low average range or higher in almost all testing categories; Dr. Siddiqui's August 2, 2016 mini mental status exam in which Hagele scored 28 out of 30; and Dr. Trello's examinations that showed normal affect, coherent and relevant conversation, intact recent and remote memory.  R. 44-47.  The ALJ also relied on the opinions of state agency Dr. Bilinsky and state agency psychologists Drs. Taylor and Low.  R. 48.

The ALJ gave little weight to Dr. Bleyer's opinions in the August 2, 2016 General RFC Questionnaire.  The ALJ found that his opinions were inconsistent with other treatment notes in the record.  The ALJ also gave little weight to Dr. Shea's February 24, 2015 opinions because they were not supported by her own treatment notes.  The ALJ cited numerous treatment notes in which Dr. Shea found Hagele had normal psychomotor function, linear and relevant thought processes, intact memory and fund of knowledge, and normal concentration.  R. 47.

After determining Hagele's RFC, the ALJ found at Step 4 that Hagele could not return to her prior work as a nurse.  R. 48-49.

At Step 5, the ALJ found that Hagele could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. part 404, Subpart P, Appendix 2, and the opinions of vocational expert Gustafson that a person with Hagele's age, education, experience, and RFC could perform sedentary jobs such as production inspectors, production workers, and hand packagers.  R. 49.  The ALJ concluded that Hagele was not disabled.  R. 50.

Hagele appealed the ALJ's decision.  On February 14, 2020, the Appeals Council denied her request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Hagele then brought this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence.  <u>Jens v. Barnhart</u>, 347 F.3d 209, 212 (7th Cir. 2003); <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The ALJ correctly found at Step 3 that the medical evidence did not meet any of the requirement of the Listings based on physical impairments such as disorders of the spine, vascular insults to the brain, or inflammatory arthritis.  The ALJ's finding that Hagele did not meet the Listings related to mental impairments was supported by the October 2015 neuropsychological evaluation and Dr. Trello's mental status examinations. At Step 4, the ALJ's RFC determination was supported by the MRI and EMG studies; the 2015 neuropsychological evaluation; the medical records

from Drs. Okoli, Carpenter, and Siddiqui; the consultative examination by

Dr. Chapa; the mental status examinations by psychologist Dr. Trello; and

the opinions of Dr. Bilinsky and psychologists Drs. Taylor and Low. The

ALJ's findings at Step 4 was supported by the RFC and the testimony of

vocational expert Gustafson.  The ALJ's finding at Step 5 was supported by

the RFC determination, the Medical-Vocational Guidelines, and

Gustafson's testimony.  The decision that Hagele was not disabled was

supported by substantial evidence.

The Court notes that Hagele relies heavily in reply that the Defendant

Commissioner did not admit or deny Hagele's statement of undisputed fact

set forth in her Motion.  She argues that under the Local Rule for motions

for summary judgment, Local Rule 7.1(D)(2)(b)(1)[2], all of her statements of

undisputed fact are admitted as a result.  See Reply to Commissioner's

Motion for Summary Affirmance (d/e 19), at 2-4.  Hagele is mistaken.  Local

Rule 7.1(D)(2)(b)(1) and Local Rule 7.1(D)(6) do not apply to judicial review

of Social Security decisions.  Rather, Local Rule 8.1 governs the summary

judgment motions here. Local Rule 8.1 does not require formal statements

of undisputed fact or formal admission or denial of such statements.  See

---

[2] The appropriate Local Rule citation governing admission of facts due to failure to respond is Local Rule 7.1(D)(6).

Local Rule 8.1(E).  The Defendant Commissioner, therefore, did not admit any of Hagele's assertions in her Motion.

Hagele argues that the ALJ's finding at Step 3 was not supported by substantial evidence and that the ALJ abused his discretion in making his decision at Step 3.  Hagele does not identify the Listing or Listings that she believes her impairments or combination of impairments meet or equal, and she does not identify any evidence that shows that her impairments meet or equal a Listing.  At best, she asks the Court to reweigh the evidence. This the Court cannot do.  Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82. The Court finds no error at Step 3.

Hagele argues that the ALJ erred in finding that the medical evidence did not support Hagele's statements about the limiting effect of her symptoms.  Hagele makes only a skeletal argument and, again, essentially asks the Court to reweigh the evidence.  Again, the Court cannot do so. See also Hernandez v. Cook County. Sheriff's Office, 634 F.3d 906, 913 (7th Cir. 2011) ("[S]keletal arguments" may be treated as waived.).[3]

Hagele argues that the ALJ's decision is inconsistent because the ALJ found at Step 2 that Hagele had severe impairments yet concluded

---

[3] For example, Hagele did not make any argument that referred to the ALJ's evaluation of the opinions of Drs. Bleyer and Shea.  Any issue related to the ALJ's evaluations of those opinions is forfeited.  Smith v. Rosebud Farm, Inc., 898 F.3d 747, 753 (7th Cir. 2018).

that she was not disabled.  There was no error.  The term "severe

impairment" at Step 2 of the Analysis means a medically determinable

impairment that just has more than a minimal effect on a person's

functional ability to perform work activities.  See 20 C.F.R. 404.1521 and

404.1522; Thomas v. Colvin, 826 F.3d 953, 959-60 (7th Cir. 2016).  Thus,

the ALJ only found at Step 2 that Hagele had medically determinable

impairments that had more than a minimal effect on her functional ability to

work.  The ALJ did not find at Step 2 that Hagele was so severely impaired

that she was disabled.  The ALJ correctly used the term "severe

impairments" at Step 2, and the ALJ's used of the term was consistent with

the decision.

Hagele notes that the ALJ made no credibility finding.  This

observation is not material.  In 2016, the Social Security Administration

ordered ALJ's not to make credibility findings in adjudicating any

applications for Disability Benefits.  Rather, the ALJ must decide whether

the claimant's statements about her symptoms were consistent with the

other evidence in the record.  SSR 16-3p, 2017 WL 5180304, at *1

(October 25, 2017) (originally issued on March 16, 2016, 2016 WL

1119029) (The Social Security Administration no longer uses the term

credibility in the evaluation of statements regarding symptoms).  The ALJ

properly followed SSR 16-3p and did not mention credibility.  The ALJ

found that Hagele's statements about her symptoms were not consistent

with the other evidence in the record.  That finding, as explained above,

was supported by substantial evidence.

Hagele argues the ALJ's hypothetical question to vocational expert

Gustafson was erroneous.  The Court disagrees.  A hypothetical question

to a vocational expert must fully set forth the claimant's impairments to the

extent they are supported by the medical evidence.  The question does not

need to include every detail of the claimant's impairments.  Herron, 19 F.3d

at 337.  The ALJ's question here was consistent with the RFC finding.  An

RFC is based on all of a claimant's medically determinable impairments:

> (1) Residual functional capacity assessment. Your
> impairment(s), and any related symptoms, such as pain, may
> cause physical and mental limitations that affect what you can
> do in a work setting. Your residual functional capacity is the
> most you can still do despite your limitations. We will assess
> your residual functional capacity based on all the relevant
> evidence in your case record.

20 C.F.R. § 404.1545(a)(1).  The ALJ's RFC finding was supported by

substantial evidence for the reasons stated above, and so, fully accounted

Hagele's impairments. The hypothetical question based on the RFC,

therefore, fully set forth Hagele's impairments that were supported by the

evidence.  The ALJ did not err in posing the hypothetical question to the vocational expert in this case.

THEREFORE, IT IS ORDERED that Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 18) is ALLOWED, Plaintiff Michelle L. Hagele's Motion for Summary Judgment (d/e 14) is DENIED, and the decision of the Defendant Commissioner is AFFIRMED. Judgment is entered in favor of the Defendant Commissioner and against Plaintiff Hagele.  THIS CASE IS CLOSED.

ENTER:   August 24, 2021

_____ s/ *Tom Schanzle-Haskins* _____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE